(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERS OF THE FORM.)

## I. (a) PLAINTIFFS

Michael Lee Andrews Trust, et. al. (See Attached Exhibit A for complete list)

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF DALLAS COUNTY, TEXAS

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jeanne Crandall, Esq.
Reyna Hines & Crandall
1201 Elm., Suite 3850
Dallas TX 75270    214-760-8100

## DEFENDANTS

Peter Licari, Fred Ehmann, Steve Fishman, Ethan Leder, and Michael D'Arcangelo

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

ATTORNEYS (IF KNOWN)

Unknown

MAY 21 2002
U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3-02CV1076-H

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☒ 2 Removed from State court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☒ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt Relations & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
  **HABEAS CORPUS:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23
**DEMAND $1,000,000**
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE Lynn (N.)    DOCKET NUMBER 3:99-CV-1242-M

DATE May 21, 2002    SIGNATURE OF ATTORNEY OF RECORD Jeanne Crandall

(These claims are incorporated in this Complaint at ¶ 172)

FOR OFFICE USE ONLY

RECEIPT $_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

MAY 21 2002

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

| | |
|---|---|
| MICHAEL LEE ANDREWS TRUST, § | |
| JAMES W. AND BONNALEE ASBURY § | |
| FAMILY TRUST, BILL AND BETTY § | |
| BARBEE FAMILY TRUST, BILL H. § | |
| BARBEE, HELEN C. BARBEE, B. HULL § | |
| BARBEE, MARTIN  & PENNY MARIS, § | |
| INDIVIDUALLY, AND AS NEXT § | |
| FRIEND OF ASHLEY BRACKEN, § | 3-02 CV 1076 - H |
| A MINOR, WENDY BRACKEN, F. E. § | |
| BROWN, JR., C-A-B PARTNERSHIP, § | |
| ALISON BLAIR COLLIER ORREN, § | |
| INDIVIDUALLY AND AS TRUSTEE § | |
| OF THE JOEL A. PATRICK § | |
| GP TRUST AND JOEL PATRICK § | |
| COLLIER 1993 TRUST, KAREN § | |
| WILLIAMS COLLIER AS TRUSTEE § | |
| OF THE CLARK COLLIER ORREN § | **JURY TRIAL DEMANDED** |
| GP TRUST AND CLARK COLLIER § | |
| ORREN 1993 TRUST, ALICE COLLIER § | |
| AS EXECUTRIX OF THE ESTATE OF § | |
| BOBBY F. COLLIER, MICHAEL J. § | |
| COLLIER, CURTIS COLLIER, § | |
| MIKE COLLIER, JR., PAT COLLIER, § | |
| CLIFFORD E. CUMBIE, CHRISTI § | |
| N. DAVENPORT, HEATHER RUFFIN § | |
| DAVENPORT, JOYCE DAVENPORT, § | |
| MELANIE DAVENPORT, TRAVIS § | |
| DAVENPORT, TYRONE DAVENPORT, § | |
| DAVENPORT ENTERPRISES, INC., § | |
| BILLIE J. EMBREY, ROBERT EMBREY, § | |
| WILLIAM AND SARAH FORD, § | |
| JAY T. GORDON, JOOST GOSSCHALK, § | |
| JONAS A. GOSSCHALK, CARROLL § | |
| V. GUICE,  JOHN & LOTTIE GUTTRY, § | |
| H & W INVESTMENTS, L.P., HOYL § | |
| OIL & MINERAL, INC., JOHN HORN- § | |
| BECK, JOHNNIE MAY HORNBECK, § | |
| WILLIAM H. HUDSPETH, O. L. § | |
| KIMBROUGH, ESTHER KNOX, JOE § | |

KNOX,  JERRY LANDERS, MICHAEL      §
C. AND KAREN C. LANDERS, TOM       §
AND DOROTHY  LANDERS, TOM AND      §
DOROTHY LANDERS FAMILY TRUST,      §
TOM W. LANDERS III AND JOAN S.     §
LANDERS, ORVAL T. LINDSEY, EARLE   §
E. LITTLE, M.D., EDWARD MACK,      §
INDIVIDUALLY AND AS TRUSTEE        §
FOR ADAM TAYLOR MACK, ALICIA       §
MACK, SARA ELIZABETH MACK          §
AND KELLY MACK,  MACK              §
ADVENTURE, LTD., JOHN AND ORA      §
FRANCIS MARTIN, W. M. MATTHEWS,    §
JR., ROGER MOSER, H. A. ORGAIN,    §
PATHOLOGY ASSOCIATION OF LONG-     §
VIEW P.A. PROFIT SHARING PLAN &    §
TRUST, HELEN PHILLIPS,  REM-TEX,   §
INC., MICHAEL SANDERS,  ESTATE     §
OF ESTELLE SMITH,, JOHN AND        §
DAURICE STEELE, BERNARD TAYLOR     §
AND VICKI THOMAS,                  §
                                   §
        PLAINTIFFS,                §
                                   §
vs.                                §
                                   §
                                   §
PETER LICARI, FRED EHMANN,         §
STEVE FISHMAN, ETHAN LEDER,        §
AND  MICHAEL D'ARCANGELO,          §
                                   §
                                   §
                                   §
        DEFENDANTS.                §

## COMPLAINT AND JURY DEMAND

Plaintiffs file this Complaint against Defendants Peter Licari, Fred Ehmann, Steve Fishman, Ethan Leder, and Michael D'Arcangelo, as follows:

## I.

## PARTIES

A.  Plaintiffs

1.  Michael Lee Andrews Trust is a trust established in 1991 by Dr. Michael Lee Andrews, a veterinarian working in Terrell, Texas, and residing in Sunnyvale, Dallas County, Texas.

2.  James W. and Bonnalee Asbury Family Trust is a trust established on February 23, 1995, by James W. and Bonnalee Asbury, both 72 years of age, and who reside in Longview, Gregg County, Texas.  James W. and Bonnalee Asbury are the Trustees of the Asbury Family Trust.

3.  Bill H. and Betty Barbee Family Trust is a trust established in 1992 by Bill H. and Betty Barbee.  Betty Barbee died in 1993 and Bill H. Barbee is the remaining and sole Trustee of the Barbee Family Trust and resides in Sterling City, Sterling County, Texas.

4.  Bill H. Barbee is a 73 year old man residing in Sterling City, Sterling County, Texas.

5.  Helen C. Barbee is an 81 year old woman residing in Paris, Lamar County, Texas. She is Bill H. Barbee's sister.

6.      B. Hull Barbee is a businessman in Kilgore, Texas. He resides in Henderson, Rusk County, Texas. He is Bill H. Barbee's son.

7.      Martin Maris is 65 years old and retired. He and his wife, Penny Maris, reside in Rockwall, Rockwall County, Texas. Martin and Penny Maris are the parents of Ashley and Wendy Bracken.

8      Ashley Bracken is a 15 year old minor child. Her mother is Penny Maris and as Next Friend brings this suit on Ashley Bracken's behalf. Said minor resides with her mother and her grandmother Joyce Davenport in Rockwall, Rockwall County, Texas.

9.      Wendy Bracken is a 20 year old woman. Her mother is Penny Maris and her grandmother is Joyce Davenport and she resides with both of them in Rockwall, Rockwall County, Texas.

10.     F. E. Brown, Jr. is a 70 year old man residing in Kilgore, Texas. Prior to his retirement, Mr. Brown was in the oil field equipment business.

11.     C-A-B Partnership is a Texas general partnership consisting of three doctors practicing in Longview, Texas.

12.     Alison Blair Collier Orren is a 34 year old woman residing in Tyler, Smith County, Texas. She is Joe A. and Sylvia A. Collier's daughter and the mother of Clark Collier Orren. She is also the Trustee of the Joel Patrick Collier, Jr. GP Trust and Joel Patrick Collier 1993 Trust.

13.    Joel Patrick Collier, Jr. GP Trust is a trust established in November, 1993 by Joe A. and Sylvia A. Collier for their grandson, Joel Patrick Collier, Jr. Alison Blair Orren is the Trustee of the trust. She resides in Tyler, Smith County, Texas.

14.     Clark Collier Orren 1993 Trust is a trust established in November 1993 by Jon Milton Orren and Alison Blair Collier Orren for their 8-year old son, Clark Collier Orren. Karen Williams Collier is the Trustee of the Trust and resides in Houston, Harris County, Texas.

15.     Joel Patrick Collier, Jr. 1993 Trust is a trust established in November, 1993 by Joel Patrick Collier and wife, Karen Williams Collier for their 8-year old  son, Joel Patrick Collier, Jr. Alison Blair Collier Orren is the Trustees of the trust and resides in Tyler, Smith County, Texas.

16.     Clark Collier Orren GP Trust is a trust established in 1993 by Joe and Sylvia Collier for their grandson, Clark Collier Orren. Karen Williams Collier is the Trustee of the trust and resides in Houston, Harris County, Texas.

17.     Bobby F. Collier was 69 years old when he died last year. He was the brother of Mike J. Collier, Joe A. Collier and Pat S. Collier.  His interests in this litigation are now represented by his widow, Alice Collier who is now 73 years old.

18.     Michael J. Collier is a 55 year old furniture store owner living and residing in Longview, Gregg County, Texas. He is the brother of Joe A. Collier, Bobby F. Collier and Pat S. Collier.

19.     Curtis Collier is 20 years old.  His father is Michael  J. Collier.  Curtis Collier resides with his father in Longview, Gregg County, Texas.

20.     Michael J. Collier, Jr. , is a 22 year old student residing in Waco, McLennan County, Texas.  He is the son of Michael J. Collier.

21.     Pat Collier is a 70  year old furniture store owner living and residing in Longview, Gregg County, Texas.  He is the brother of Mike J. Collier, Joe A. Collier and Bobby F. Collier.

22.     Clifford E. Cumbie is a 50 year old salesman working and residing in Dallas, Dallas County, Texas.

23.     Christi N. Davenport is the 22 year old daughter of Tyrone Davenport and the grandchild of Joyce Davenport.  She resides with her husband in Royce City, Texas.

24.     Heather Kimberly Ruffin Davenport is a 30 year old schoolteacher.  She is the daughter of Tyrone Davenport and the grandchild of Joyce Davenport.  She resides in Rockwall, Rockwall County, Texas.

25.     Joyce Davenport is a widow, age 75 who resides in Rockwall, Rockwall County, Texas.  She is the mother Tyrone E. Davenport and  Penny Maris.

26.     Melanie Davenport is a 25 year old woman and is the daughter of Tyrone Davenport and the grandchild of Joyce Davenport.  She is a student and resides  in Rockwall, Rockwall County, Texas.

27.     Travis Davenport is a 26 year old man and is the son of Tyrone Davenport and the grandchild of Joyce Davenport.  He is a computer engineer and resides  in Rockwall, Rockwall County, Texas.

28.     Tyrone Davenport is a 54 year old man and is the son of Joyce Davenport and the father of Christi N. Davenport, Heather Davenport, Melanie Davenport and Travis Davenport.  He resides with his wife Cheryl Davenport in Rockwall, Rockwall County, Texas.

29.     Davenport Enterprises, Inc. is a Texas corporation.  Joyce Davenport is the President and registered agent of the corporation with its registered office being in Rockwall, Rockwall County, Texas.

30.    Billie J. Embrey is a 71 year old businesswoman working and residing in Longview, Gregg County, Texas. She is the wife of Robert D. Embrey. She is also the Vice President of Remtex, Inc.

31.    Robert D. Embrey is a 77 year old businessman working and residing in Longview, Gregg County, Texas. He is the President of Remtex, Inc.

32.    William and Sarah Ford are husband and wife, ages 75 and 71 respectively, residing in Waco, Texas. Prior to his retirement, Mr. Ford was a farmer.

33.    Jay T. Gordon is a dentist working and residing in Longview, Gregg County, Texas.

34.    Joost Gosschalk is a 54 year old salesman working and residing in Longview, Gregg County, Texas. He is the father of Jonas A. Gosschalk.

35.    Jonas A. Gosschalk is a 25 year old intern working and residing in Longview, Gregg County, Texas.

36.    Carroll V. Guice is a chiropractic orthopedist working and residing in Longview, Gregg County, Texas.

37.    John & Lottie Guttry are husband and wife, residing in Longview, Gregg County, Texas.

38.    H.& W Investments, L.P., is a Texas family limited partnership. Betty Hornbeck is its general partner.

39.    John Hornbeck is 54 years old and currently resides in Atlanta, Georgia. Prior to his retirement two years ago, he was a high school choir director.

40.    Johnnie May Hornbeck is a widow, aged 88, who currently resides with her son,

John Hornbeck, in Atlanta, Georgia.

41.     Hoyl Oil & Mineral, Inc. is a Texas corporation owned and controlled by Joyce Davenport.

42.     William H. Hudspeth is a 52  year old businessman working and residing in Kilgore, Gregg County, Texas.

43.     O. L. Kimbrough is an 89 year old retired wholesale gasoline and automotive parts distributor.

44.     Esther Knox is an 84 year old widow who resides in Longview, Texas.

45.     Joe Knox is a 45 year old businessman residing in Longview, Texas.

46.     Jerry Landers is a 50 year old computer programmer working and residing in Houston, Harris County, Texas.

47.     Michael C. and Karen C. Landers are husband and wife, ages 55 and 53 respectively, and reside in Mandeville, Louisiana.  Michael C. Landers is a sales representative.

48.     Tom and Dorothy Landers are husband and wife, ages 80 and 79 respectively, and reside in Longview, Gregg County, Texas.  Mr. Landers is a retired business owner of a Longview insurance agency.  Tom and Dorothy Landers are the parents of Michael C. Landers, Tommy W. Landers III and Jerry Landers.

49.     Tom and Dorothy Landers Family Trust is a trust established by Tom W. Landers and Dorothy E. Landers in 1991.  Tom W. Landers III is the trustee and resides in Santa Ana, California.

50.     Tom W.  Landers III and Joan S Landers  are husband and wife, ages 57 and 54 respectively, and reside in Santa Ana, California.

51.     Orval T. Lindsey is a 55 year old pharmaceutical salesman, residing in Quitman, Wood County, Texas.

52.     Dr. Earle E. Little is a retired doctor, aged 72, who resides in Longview, Texas

53.     Dr. Edward Mack is a 76  year old retired dentist, residing in Longview, Gregg County, Texas.

54.     Adam Taylor Mack is the 8 year old grandson of Dr. Edward Mack.  Dr. Edward Mack is trustee and/or custodian and resides in Longview, Gregg County, Texas.

55.     Alicia Mack is the wife of Dr. Edward Mack.  Both reside in Longview, Gregg County, Texas.

56.     Kelly Mack is the 46 year old son of Dr. Edward Mack and the father of Adam Taylor Mack and Sara Elizabeth Mack.  Dr. Edward Mack is the trustee on the note and resides in Longview, Gregg County, Texas.

57.     Sara Elizabeth Mack is the 6 year old grandchild of Dr. Edward Mack.  Dr. Edward Mack is the trustee on the note and resides in Longview, Gregg County, Texas.

58.     Mack Adventure, Ltd., is a Texas limited partnership registered and doing business in Longview, Texas.   Ben Mack is the general partner.

59.     John and Ora Frances  Martin are husband and wife, ages 75 and 74 respectively who reside in Longview,  Texas.  Prior to his retirement, Mr. Martin was a machinist in Tyler for 30 years.

60.     W. M. Matthews, Jr. is a 77 year old retired rice farmer and cattle rancher, residing in Anahauc, Chambers County, Texas.

61.     Roger Moser, Sr. is 56 years old and is a General Manager working and residing in Longview, Gregg County, Texas.

62      H. A. Orgain is 83 years old.   Before retirement, Mr. Orgain was a retail merchant.  He resides in Longview, Gregg County, Texas.

63.     Pathology Association of Longview P.A. Profit Sharing Plan & Trust, is a qualified plan and trust created for the benefit of Dr. Stephen Somerville, who lives and works in Longview, Texas.

64.     Helen Phillips is a 73 year old retired schoolteacher working and residing in Longview, Gregg County, Texas.

65.     Rem Tex, Inc., is a Texas corporation established in 1971 and with its registered office in Longview, Gregg County, Texas.   Mr. Gary Embrey is the registered agent of the corporation.

66.     Dr. Michael Sanders is a healthcare professional specializing in the treatment of cancer and resides in Longview, Gregg County, Texas.

67.     Estelle Smith was a 90 year old woman residing in Shreveport, Louisiana.  She died last year and her estate is represented by her daughter, Billie J. Embrey.

68.     John and Daurice Steele are husband and wife, ages 71 and 70 respectively, residing in Hamlin, Texas.  Prior to his retirement, Mr. Steele was a farmer.

69.     Dr. Bernard Taylor is a physician specializing in the treatment of cancer and resides in Longview, Gregg County, Texas.

70.     Vicki M. Thomas is an 89 year old woman who lives in Longview, Texas.

B.    Defendants

71.    Peter Licari is an individual residing at 780 Louis Lane, Ambler, Pennsylvania 19002.  Licari is a citizen of the state of Pennsylvania.

72.    Frederick H. Ehmann is an individual residing at 2203 Lincoln Drive, Huntington Valley Pennsylvania 19006.  Ehmann is a citizen of the state of Pennsylvania.

73.    Steve Fishman is an individual residing at 570 Pennllyn, Blue Bell Pike, Blue Bell Pennsylvania 19422.  Fishman is a citizen of the state of Pennsylvania.

74.    Ethan Leder is a citizen of the state of Maryland.

75.    Michael D'Arcangelo is an individual residing at 149 Winchester Lane, Newtown, Pennsylvania 18940.  He is a citizen of the state of Pennsylvania.

## II.

## JURISDICTION

76.    Jurisdiction over the subject matter of this action properly lies in this Court pursuant to 28  U.S.C. §1332 inasmuch as this is a dispute  between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Jurisdiction also exists over the subject matter of this action pursuant to 28 U.S.C. section 1404 inasmuch as this case is related to 39 bankruptcy cases pending in this district.

77.    Jurisdiction over each of the persons comprising the defendants exists based on the fact that each of these defendants were doing business in this state, committed tortious conduct and other purposeful acts and contacts within the State of Texas sufficient for the exercise of in personam jurisdiction.

78.    Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the event or omissions giving rise to the claims occurred in this District and because a substantial part of the property that is the subject of the action is situated in this District.   In the alternative, venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §1409(a)  because the case is related to 39 bankruptcy cases pending in the Northern District, Dallas Division, under the names Chartwell Healthcare, Inc., and East Texas Healthcare, Inc (joint administration).

### III.

### FACTS APPLICABLE TO ALL COUNTS

**A.    Introduction**

79.    The Plaintiffs are part of a total of 140 people who were solicited to purchase and thereafter purchased ten-year promissory notes issued by subsidiaries of Chartwell Healthcare, Inc. (hereinafter "Chartwell") totaling  $14 million.  The notes were secured by  "first priority" liens on the Medicaid and Medicare-insured healthcare receivables of the nursing homes acquired with the proceeds of the notes.

80.    The notes were offered in over 15 different series of offerings over the period May 1993 through March of 1998.

81.    The Plaintiffs were told that their investments were essentially guaranteed by federal and state governments because the promissory notes were fully secured by Medicare and Medicaid-insured healthcare receivables.

82.    The Offerings were illegal under federal and state securities laws because the securities were not registered, the persons engaged in soliciting the funds were not registered, and

the offerings were made to individuals who were neither sophisticated nor well-informed about the investments.

83. By the end of 1997, the Plaintiffs and other individuals not named in this Complaint were, as a class, Chartwell's largest secured creditor, with a "first priority" security interest on virtually all of Chartwell's revenues and receivables. Chartwell was insolvent at this time, having incurred a $10 million taxable loss for the 1997 calendar year.

84. It was in this context that an aggressive accounts receivable lender founded and managed by defendant Leder took control of Chartwell's revenue stream and unilaterally and unlawfully converted Plaintiffs' "first priority" secured interest to benefit his Company-- a Company that had never suffered a credit loss and which was actively seeking to merge with Heller Healthcare Finance, Inc. (which occurred in 1999). Defendant Leder became a multimillionaire as a result of that merger. Plaintiffs lost more than $5 million as a result of the transactions engineered by Defendant Leder.

**B. Leder Aggressively Builds Healthcare Financial Partners into a Public Company Through Syndicated High Yield Financing and Relationships with Aggressive Growth Healthcare Companies**

85. In 1993, at the age of 29, defendant Leder formed a healthcare finance corporation with a classmate, John Delaney, known as HealthPartners Financial Corporation ("HFP"). With a background in mergers and acquisitions, Leder aggressively expanded the corporation by making collateral-based loans to companies with no bankable credit using funds from venture capitalists and syndicated financing. Under the AR Advance Program, engineered by Leder, the Company earned enormous yields on money advanced for receivables. The yield on finance receivables generated under the AR Advance Program was 26.9% during the year ended December 31, 1995.

86.    In 1997, Leder boasted that the Company had never suffered any credit loss, employing a  formula that advanced only 65 to 85 percent of the insured healthcare receivables conveyed to it as security.  By requiring large origination and termination fees, management fees during the term of the loan,  and a blanket security interest in all the borrower's assets, the Company  was obtaining a yield of over 17% on advances to companies in financial distress--- companies with a history of unprofitability that would not qualify for loans from a traditional lender.

87.   The net income for HFP, which changed its name to Healthcare Financial Partners on September 13, 1996, skyrocketed in 1997, after a November 1996 initial public offering which provided substantial additional funds for acquisitions and growth.  The Company's net income grew from $195,337 in 1995 to $7,994,848 in 1997.

88.  The Company's assets (loans) increased 168.9% from $101.3 million at January 1, 1997 to $272.4 million at December 31, 1997, and growth continued in early 1998 as the Company's assets increased to $296.2 million at January 31, 1998.  According to public reports, a substantial part of these loans were concentrated in a few companies.  At December 31, 1996, outstanding finance receivables to seven clients comprised approximately 50% of the total finance receivable portfolio.  At December 31, 1997, outstanding finance receivables to three clients comprised approximately 14% of the total finance receivable portfolio.  On information and belief, one of these major customer relationships was Complete Care Services and companies affiliated with its founder, Peter Licari.

89.  After experiencing 1400% growth from 1996 to 1997, the Company aggressively

engaged in acquisitions in 1998 in an effort to sustain its record of growth. The Company engaged lawyers, accountants and consultants in the healthcare industry for referral of both customers and complementary business operations for acquisition.

90. Steve Fishman, a consultant with widespread, lucrative relationships in the industry, and Frederick Ehmann, an attorney with a 12 year history with Fishman and Licari, were close confidants and key participants to the growth of Leder's Company.

## C. Leder's Relationship with Fishman, Ehmann, and Licari

91. In March 1997, Steve Fishman (together with his partners Greg Lentz, Alan Morrison, and Janet Himmelreich) purchased the healthcare consulting business of their employer, an accounting firm named Zelenkofske Axelrod, and formed a company called Zelenkofske Axelrod Consulting, LLC ("ZA Consulting"). On information and belief, Leder was instrumental in the formation of ZA Consulting and intended to use the valuable contacts of this company to expand HFP's business in financing healthcare receivables of small and mid-range companies. In December 1997, HFP loaned $2 million to ZA Consulting in return for a preferred membership interest in the Company which was secured only by the equity of the Company. Subsequently, on May 1, 1998, HFP contributed the $2 million promissory note to ZA Consulting in return for a 49% interest in the Company. HFP continues to hold a carried interest in the earnings of ZA Consulting. ZA Consulting is located in a suburb of Philadelphia.

92. Fishman had known both Peter Licari and Fred Ehmann (both based in Philadelphia) for over ten years. Ehmann was a lawyer and Fishman was an accountant. Both did work for many of the same clients, the most significant of which was Peter Licari and the company he founded, Complete Care Services ("CCS").

93.   Since its founding in 1989,  CCS grew rapidly over the years through aggressive acquisitions of nursing homes and the management contracts associated with those homes, largely as the result of Peter Licari's  relationships with regulators and healthcare providers in this small and close-knit industry.  If a company had nursing homes for sale, Licari was interested.  If necessary, Licari would arrange for an ownership structure in order to obtain the right to manage large blocks of nursing homes.  Peter Licari, and Ethan Leder were involved in many deals together and dealt with each other  on a first name basis  for a considerable time before the events set forth herein occurred.

94.  For example, in  June 1997, Licari and CCS arranged for the transfer of 48 nursing homes in Texas to an entity known as 22 Texas Services, Inc. (owned by CCS principals) in return for the right to manage the homes.  The financing of the transfer from Beverly Enterprises to 22 Texas Services was arranged by  Fishman  who negotiated a $15 million line of credit with Leder from Leder's company, HCFP.  In February 1998, CCS arranged for the transfer of 89 nursing homes to a company known as Senior Living Properties.  Again, the transaction was financed  by  HCFP, with the assistance of Steve Fishman.

95.  By 1998,  CCS was managing 220 nursing homes, over 137 of which were financed through Leder and his financing company affiliates.

**D. Formation of a Joint Venture Between Fishman (individually and as an undisclosed agent for Leder) and CCS Principals Licari, Ehmann and D'Arcangelo**

96.  On April 6, 1998, as an "accomodation" to Leder,  Ehmann formed a limited liability company known as FELD, LLC.   FELD stands for F-Fishman, E-Ehmann, L-Licari, and D-D'Arcangelo.  The purpose of FELD was to "own and operate nursing homes and to do any and all things necessary, convenient or incidental to that purpose."

97.  Fishman and Ehmann executed an Operating Agreement on April 6, 1998, under which each of them, together with undisclosed Persons with a "relationship" with these defendants, acquired a 50% ownership interest in FELD, LLC.   The agreement provided that Fishman and Ehmann would not be required to contribute more than $100 to FELD, and that neither of them would have any personal liability for any obligations of FELD.  Cash flow generated each year from FELD holdings was to be distributed to "Interest Holders," defined as "any Person who holds an Interest, whether as a Member or an unadmitted assignee of a Member."  On information and belief, Leder, Licari, and D'Arcangelo were "Interest Holders" who had the right to control the ownership, management, and disposition of properties acquired under the FELD corporate structure.

98.  Shortly after the formation of FELD, Leder directed HCFP's loan officer to declare a default under the Chartwell accounts receivable facility.

### E.  Leder Acquires Control of Chartwell's Valuable  Healthcare Receivables and  Converts Plaintiffs' Secured Property to a Lockbox Controlled by HCFP Funding, Inc.

99.  In late 1997 and early 1998, Leder initiated and approved two accounts receivable loans to Chartwell-related companies which had previously pledged all of their accounts receivable to the Plaintiffs.  On November 14, 1997, HCFP Funding, Inc. originated  a $7.5 million Revolving Credit Loan to Valley Health Group, Inc. and its affiliates, a home health business operating in four states which had  been recently acquired by Chartwell Home Healthcare, Inc.

100.  HCFP Funding, Inc.  funded $6 million on the Valley loan on November 17, 1998.  Subsequently, Leder refused to fund any amount on the Valley line that wasn't previously forwarded to it as collections.  Leder essentially purchased the revenue stream for a one time payment of $6 million.

101. Anxious to obtain control of Chartwell's more lucrative nursing home business, Leder, met with Irving Boyes in 1997, urging him to negotiate a new "accounts receivable facility" for Chartwell's 28 nursing homes. The new loan would cross-collateralize a $1.5 million "overline" on the Valley loan, caused by Medicare offsets for overpayments made prior to Chartwell's acquisition of Valley.

102. Leder knew or should have known that by inducing the Chartwell corporations to convey a "first priority" security interest in the nursing home receivables to HCFP Funding, Inc., such corporations would be in breach of existing contractual duties owed to the East Texas Noteholders. Leder insisted that all Medicaid and Medicare healthcare receivables (comprising 90% of Chartwell's revenues and 90% of Plaintiffs' secured property) be deposited directed by the Medicaid and Medicare fiscal intermediaries into a lockbox controlled exclusively by HCFP Funding, Inc.

103. Leder subsequently conditioned the Chartwell Healthcare facility to draws funded in HCFP's "sole discretion" and established an $800,000 reserve to cross-collateralize the overadvance on the Valley Loan.

104. In 1998, Chartwell's operating expenses for its 28 nursing homes, excluding debt service, consisted of payroll in the amount of $3.6 million per month, rent in the approximate amount of $1 million per month, prescription drugs, food, medical and other supplies, utilities, and professional staffing. Accordingly, to fund Chartwell's essential services, HCFP Funding, Inc. would have to fund a bare minimum of $5 million in draws each month. HCFP never funded a sufficient amount to cover Chartwell's essential operating expenses, and yet Leder insisted on controlling all of Chartwell's revenues. Leder knew or should have known that the

loan terms it solicited and implemented in its "sole discretion" would ultimately lead to seizure of Chartwell's assets in derogation of the Plaintiffs' prior liens on such assets.

105.    HCFP Funding, Inc. refused to fund any draw unless it first received the "collections." Within just a few months of the initial advance, HCFP Funding, Inc. was funding less to Chartwell than it received from Chartwell in collections. The following is the funding and collection history on HCFP Funding's accounts receivable facility with Chartwell:

| HCFP Funding | HCFP Collections |
|---|---|
| 2/19   $3,599,994 | |
| 2/24   $ 186,994 | 2/26   $400,852 |
| | 3/6    $494,385 |
| | 3/12   $986,294 |
| 3/13   $1,981,489 | |
| | 3/19   $1,769,462 |
| 3/20 $1,728,225 | |
| | 3/24   $1,161,569 |
| 3/25 $1,045,189 | |
| | 4/3    $702,939 |
| 4/6   $1,395,372 | |
| | 4/14  $1,174,423 |
| 4/17 $499,994 | |
| 4/20 $499,994 | |
| | 4/23  $988,407 |
| 4/23 $861,474 | |
| 5/1  $1,162,206 | |
| | 5/4   $1,016,569 |
| 5/4 $747,994 | |
| | 5/11 $ 760,465 |
| 5/13 $883,162 | |
| | 5/20 $1,483,233 (lockbox) |
| 5/22 $679,994 | |
| | June $3,444,806 (lockbox) |
| 6/1   $246,994 | |

|  | | |
|---|---|---|
| 6/4 | $377,994 | |
| 6/11 | $465,644 | |
| 6/15 | $690,994 | |
| 6/18 | $437,994 | |
| 6/24 | $170,994 | |
| 6/26 | $308,994 | |
| | | July $2,415,916 (lockbox) |
| 7/1 | $249,994 | |
| 7/14 | $854,994 | |
| 7/22 | $829,994 | |
| 7/28 | $555,994 | |
| Total | $20,362,665.43 | $16,799,320 |

Balance Due on 7/31          $3,563,345

106.   In short, there was very little "financing" at all on the HCFP Funding line of credit after the initial advance.  The amounts funded by HCFP were insufficient to cover monthly payroll, let alone rent, utilities, and other essential services, and yet Leder insisted that Chartwell transfer all of its cash revenues to HCFP.

**F.   Leder Unlawfully Combines, Conspires and Agrees with Fishman, Licari, Ehmann and D'Arcangelo to Take Control of Chartwell's Business and Convert the Plaintiffs' Secured Property to "Special Utility" Entity They Created and Controlled**

107.   Faced with a $1.8 million, monthly shortfall in essential funding, Chartwell officers demanded a meeting with Leder at HFP's offices in Chevy Chase, Maryland, which occurred on May 28, 1998. At the meeting, Leder refused to provide additional funding and instead demanded that Chartwell sell its assets or refinance the line within 90 days. The demands made by Leder at the meeting on May 28, 1998, were later memorialized in the parties' correspondence as "exit strategies." As a condition to further funding, Leder demanded that Chartwell "aggressively" and "persistently" make efforts to sell all or part of the Company. Leder also

demanded that Chartwell seek third party financing to pay all principal and interest on the Valley indebtedness.

108. On the following day, May 29, 1998, at the suggestion of Leder, Chartwell's chief financial officer, Steve Morehead, contacted CCS. Morehead made an offer to sell all of the stock of Chartwell Healthcare, Inc. for $25 million in a sales package which he provided to Licari's subordinate, Wally Canon, on June 2, 1998. Canon signed a confidentiality agreement on behalf of CCS. Pursuant to the terms of the Confidentiality Agreement, dated June 2, 1998, Canon agreed on behalf of CCS that its employees, including Licari and D'Arcangelo:

> (a) "will not utilize the Confidential Information to engage, directly or indirectly, in any business activity which is in competition with any business activity of the Company"

> (b) "will not take any action or do anything which unfairly or unlawfully injures or damages the business prospectus [sic] or good will of the Company" and

> (c) "will not disparage or demean the Company to anyone or make any negative statements about the Company orally or in writing unless otherwise required by law after final court order by a court of competent jurisdiction."

Licari, Ehmann and D'Arcangelo violated each of these provisions of the confidentiality agreement. CCS received a packet of financial information, including Chartwell's loan documents with HCFP Funding, Inc. on June 2, 1998. On information and belief, each of defendants Leder, Licari, D'Arcangelo, and Fishman thereafter shared the information they received in their different capacities as existing lender and purported purchaser of the Chartwell stock.

109. Just two days after receiving the sales packet, on Thursday and Friday, June 4 and 5, Leder arranged for HCFP to conduct an extensive audit of Chartwell's financials at

Chartwell's corporate headquarters.  The following Monday, June 8,  1998, Morehead wrote the following letter to Mike  Lautensack of CCS (a letter concealed by Morehead in a storage facility rented under his wife's name):

> As we discussed, the sale will be structured as a stock sale with the close to be on or before July 31, 1998.... It is important that this transaction remain confidential.  I will be happy to accompany any due diligence teams during the facility tours.

On June 24, 1998, after Lautensack's review of the financials,  Wally Canon told Morehead that CCS was "very interested" in continuing the transaction.  Lautensack confirmed on July 2, 1998, that CCS would soon provide a  letter of intent confirming its intention to purchase the stock of Chartwell Healthcare, Inc.

110.    Between June 2  and July 15, 1998, both Licari  and Leder had ample opportunity to conduct due diligence  into Chartwell's operations and financial condition, including the more than $5 million in long term debt owed to the Plaintiffs   Documentation generated in related litigation demonstrates conclusively that Leder knew all about the indebtedness owed to the Plaintiffs  by no later than July 23, 1998.  Licari conducted valuation studies, profitability analyses by lease, and detailed analyses of accounts receivable.  CCS conducted facility tours and interviewed key Chartwell employees.

111.   Leder made it clear to Fishman, Licari, and Ehmann during this period that he wanted Licari  to take over the management of Chartwell's nursing homes.  On information and belief,  Leder was waiting only for MedCap to refinance the Valley line before implementation of his takeover plan.    It is no accident that the demise of Chartwell's nursing homes on July 31 was just 4 days after the Valley line of credit was refinanced with MedCap, another healthcare receivables lender referred to Chartwell by  Leder and HFP.

112.    On July 15, 1998, Morehead told CCS the "good news" that Valley (a third tier subsidiary of Chartwell) could be "separated" from the Chartwell stock sale. Medcap agreed to refinance HCFP's loan to Valley at about the same time. On the same day, with knowledge and in furtherance of the defendants' fraudulent scheme to unlawfully convert the Plaintiffs' secured property and takeover Chartwell operations which generated that secured property,   defendant D'Arcangelo  signed  a Letter of Intent on behalf of CCS to  acquire the stock of Chartwell Healthcare, Inc., which it identified as the owner of  26 nursing facilities, or 3114 beds. On information and belief, the Letter of Intent was drafted by Ehmann and his law partners. The purchase price was identified by the following formula:  8 times the projected 1998 net operating income after rent payments plus/minus the product of the current assets less current liabilities and current long term debt.   Complete Care budgeted the projected net operating income at $8,516,178.

113.  On July 22, 1998, Chartwell made a counteroffer to the purchase. Chartwell, which then owned 25 nursing facilities with 2994 beds  would sell its  stock to Complete Care Services, L.P. for $24 million.  .

114.  By July 23, 1998, Licari and CCS had conducted sufficient due diligence to conclude that CCS would acquire 22, not 25 of Chartwell's nursing homes.  Licari stated that CCS would not  acquire Chartwell's three Miami homes, El Ponce de Leon, Jackson Manor, and Arch Creek. By no later than this date, Leder knew that Chartwell had previously pledged the accounts receivable which collateralized HCFP's loans. However, Leder made no effort to contact the Plaintiffs and proceeded, with Licari, to swiftly takeover Chartwell's nursing homes.

115.  On July 24, 1998, at the request of Leder, Ehmann formed a new shell corporation, "22 Acquisition Corporation" owned by FELD, LLC, which the defendants agreed would takeover Chartwell's 22 nursing home operating leases. Fishman, Licari, and Ehmann negotiated the financing terms with Leder.

116.  The eventful week of July 27, 1998, began with a surprise survey by regulators in each of the states of Texas, Missouri, and Florida of all of Chartwell's nursing homes. Licari and Ehmann were familiar with top officials of the Texas Department of Healthcare Services ("TDHS") and the Florida Agency for Healthcare Administration ("AHCA") because CCS was already operating facilities in these states, and Ehmann was CCS' lawyer.   They were in a position to both receive and disclose information that rapidly escalated the financial crisis that Chartwell was facing at the time. As a result of their purchase negotiations with Chartwell, they had access to confidential information that they would not otherwise have.

117.  On or about the same day,  HCFP received almost $ 6 million from Medcap's refinance of  HCFP's loan to Valley, eliminating HCFP's exposure on the Valley accounts receivable line.

118.  On July 29, 1998,  HCFP's loan officer on the Chartwell line,  Jeff Hoffman, received a phone call from a therapy company, Trinity Rehabilitation, which had therapists on-site in four of Chartwell's  nursing homes in Texas, and also had a substantial loan with HCFP Funding.  Trinity's president  informed Hoffman that Chartwell's payroll had been delayed the previous week, and asked whether he should pull his therapists out of the Texas nursing homes. Hoffman told Trinity that HCFP  would take care of the payroll, and to keep the therapists on-

site. Trinity confirmed with Chartwell that HCFP had agreed to fund the payroll, and that its therapists would be paid.

119. Leder contacted Licari on Thursday, July 30, 1998, advising him of the payroll default, and requesting that CCS step in immediately and take control of Chartwell's nursing homes. Licari contacted top officials at each of the state healthcare agencies and assured them that CCS was going to acquire Chartwell's nursing homes and would take care of the payroll. Leder had already told Licari that his company would finance the payroll if Licari took over the nursing homes but not if Chartwell continued to control the nursing homes. Licari informed state regulators that Chartwell was unable to fund payroll, and that CCS, with the permission of Chartwell and its lender, HCFP, was taking control of the facilities. CCS and HCFP representatives appeared jointly to regulators, assuring them that they would take control of the nursing home operations. Based on these conversations, each of the states of Florida, Missouri, and Texas, simultaneously arranged to institute emergency receivership proceedings against the Chartwell nursing homes at the very same time that Chartwell was negotiating a purchase transaction with Licari and Leder. .

120. HCFP's Loan and Security Agreement, dated February 11, 1998, did not authorize HCFP to take possession of the leaseholds or otherwise operate the nursing homes. HCFP's security interest was limited to the accounts receivable which it funded. Leder and HCFP had no right to repossess Chartwell's operating leases or otherwise direct the defendants and their corporate affiliates to do so.

121. On July 31, 1998, Chartwell prepared, executed, and at 4:00 p.m., had an attorney at the courthouse to file Chapter 11 bankruptcy petitions. At approximately 4:00 p.m., Licari

contacted Steve Morehead and stated that he knew about Chartwell's payroll problems and that in light of those problems, CCS would pay only $4 million for Chartwell's stock.   Morehead forwarded the call to Boyes who agreed to negotiate the terms of a stock purchase agreement the following day. Licari knew that Chartwell's primary objective was to get funding for the payroll due Saturday, August 1, 1998, and he told Boyes that he could "arrange" for that. Based upon this assurance, the Chartwell attorney was recalled from the courthouse and the bankruptcy petition was not filed.

122.   The purchase negotiations were conducted by telephone by and between Peter Licari on behalf of CCS and 22 Acquisition Corporation, and Irving Boyes and Steve Morehead on behalf of Chartwell Healthcare, Inc. and its subsidiaries.   Licari testified that he spent over 12 hours on the phone that day, talking to Chartwell's regulators, Leder, Chartwell, and his lawyer and business partner, Fred Ehmann.

123.   Licari  refused to fund the payroll (which he knew but Chartwell did not know would be funded by HCFP) until Chartwell signed a letter agreement dated August 1, 1998. The first and only draft of the letter agreement was faxed to Boyes at approximately 5:00 p.m. Licari had earlier represented to  Chartwell's state regulators in Texas and Florida that CCS was acquiring Chartwell's stock and that because of the acquisition, payroll checks would be federal expressed to the nursing homes for delivery the following day. It appears that Chartwell negotiated in the agreement was a definite commitment by CCS to fund the payroll.

124.   On its face, the letter agreement states that "[t]his letter, if accepted, constitutes a binding agreement between the parties..."   The agreement was signed by Peter Licari, as president of 22 Acquisition Corporation and Irving D. Boyes, as president of Chartwell

Healthcare, Inc. Licari never was formally appointed as an officer, director or employee of 22 Acquisition Corporation, but he made all the essential decisions concerning the only asset that 22 Acquisition Corporation would ever own. The funding obligations of 22 Acquisition Corporation were guaranteed by CCS through the following provision executed by Peter Licari as president of CCS :

> Complete Care Services ("CCS") hereby agrees that for the purposes
> of Paragraph 8 hereof, should 22 Acquisitions Corp. fail to make the
> required funding, then CCS shall cause the required funding to be timely made.

125. Paragraph 8 of the August 1, 1998 letter agreement provides that 22 Acquisitions Corporation "shall cause funding of not more than two million dollars ($2,000,000) to be made into Seller's payroll account on August 3, 1998, for the exclusive use of making payroll for each of the Nursing Homes and the payment of related taxes; provided, however, that there shall be no prohibition on the consummation of this transaction as proposed or Buyer shall not have discovered a material undisclosed contingency which would severely impair the transaction."

126. On the fax cover sheet accompanying the executed letter agreement, Chartwell's CEO confirmed that he would release the payroll checks for overnight delivery to the nursing homes. Chartwell's accounting staff were called in at approximately 3:00 p.m. to prepare updated financial statements and schedules. They were instructed to give CCS anything they wanted in their due diligence review, scheduled for Sunday morning, August 2, 1998.

127. The due diligence team consisted of representatives of both HCFP and CCS. The team, consisting of managers, analysts, and accountants, conducted a thorough review of all Chartwell financials from approximately 10 a.m. until 9 p.m. They reported their findings to

CCS and HCFP managers who met with Peter Licari at his Dallas hotel room that night. Licari telephoned Leder who also participated in the meeting by telephone.

128. The next morning, August 3, 1998, Peter Licari telephoned Chartwell's Steve Morehead and announced that CCS and 22 Acquisition Corporation would not complete the stock transaction set forth in the August 1, 1998, Agreement, relying on the proviso excusing the sale in the event of material undisclosed contingencies. Licari added that CCS would not fund the payroll which had already been delivered and distributed to the nursing homes pursuant to Licari's instructions on Saturday.

129. Faced with personal liability on $2 million of NSF payroll checks containing his signature and the potential threat of criminal liability, Chartwell's chief executive, Irving Boyes, agreed to sell over $8 million in outstanding accounts receivable and Chartwell's most valuable operating leases for the price of a single payroll. The new asset purchase agreement, drafted by CCS lawyers, was dated August 3, 1998. Simultaneously with the negotiation of this new agreement, Leder arranged for HCFP to seek and obtain a temporary restraining order on August 3, 1998, freezing all Chartwell bank accounts, including the payroll accounts which formed the consideration of the August 3, 1998, agreement, and requiring account debtors to pay outstanding accounts directly to HCFP's lockbox.

130. The temporary restraining order, which effectively gave HCFP control over Chartwell's more than $14 million in accounts receivable was unlawful, and failed to provide notice to the Plaintiffs as parties known to have a security interest in the accounts receivable. The Temporary Restraining Order gave HCFP control of $14 million in receivables as security for indebtedness of less than $3.5 million. By taking control of collateral in excess of its debt,

HCFP became a fiduciary to the Plaintiffs to preserve, maintain, and dispose of the collateral in a commercially reasonable manner, which it failed to do.    Leder and the other defendants participated in this breach of fiduciary duty as set forth below.

131.  Despite defendants' agreement to fund payroll by no later than Monday, August 3, 1998, the defendants did not fund anything until the following day, August 4, 1998.  By that time, ADP reported that they had received NSF notifications on nine different operating accounts, and the states of Florida, Missouri, and Texas initiated emergency receivership proceedings on all Chartwell nursing homes.

132.  Desperate to reach some deal, Chartwell essentially agreed to sign anything defendants  presented to it in return for funding of the payroll.  Three different drafts of the August 3, 1998, letter agreement were faxed to Chartwell's attorney at 12:29, 1:09, and 3:12 p.m.  Each of the drafts required Chartwell to "cooperate with 22 in the collection of the HCFP Debt" and assign its most valuable leases,  the leases it obtained from Beverly Enterprises, as well as the accounts receivable from the Beverly leases, to 22 Acquisition Corporation for a cash payment of $576,000 "which will be used exclusively to fund delinquent payroll at the Beverly Homes."  The last draft, executed at approximately 5:12 p.m., provides  for the conveyance of 12 operating leases (the Beverly homes and two Dallas homes) and the accounts receivable due and subsequently accruing from these nursing homes in return for a one-time cash payment of $1,010,000 "which will be used exclusively to fund delinquent payroll at the Beverly Homes, the Dallas Homes, and three nursing facilities located in Dade County, Florida.  22 Acquisition Corporation also agreed to assume all of the debt owed by Chartwell on the Beverly Homes and the Dallas Homes and issue subordinated notes  to East Texas Healthcare and Chartwell

Healthcare Services of Florida  totaling $4 million, payable over 20 years with interest only at a rate of five percent for the first ten years.  "The notes [were to be] subordinated to normal operating expenses to include by way of example all vendor costs, a management fee not to exceed five percent of the monthly revenues, rent and all taxes other than income taxes, however, the notes will not be subordinated to earnings or any related party payments other than the management fees."

133.  Prior to Chartwell's execution of the August 3 agreement, Leder reached  separate undisclosed agreements with Peter Licari, who was then representing both CCS and 22 Acquisition Corporation.  In a letter agreement faxed to Licari at approximately 3:00 p.m., Leder stated that HCFP would  provide financing in the amount of $791,000 in connection with the acquisition plus all debt owed by Chartwell in connection with the acquired homes in return for 22's assumption of the Chartwell debt on the acquired homes, which was first estimated at $2,922,000 and later increased to $6,333,295.  Significantly, 22 Acquisition Corporation also agreed to grant HCFP a warrant exercisable on nominal consideration to acquire 33.33% of the capital stock of 22 Acquisition Corporation. HCFP valued this warrant at $2.3 million.   The lender, HCFP II, also received  a  security interest in all of the issued stock of 22 Acquisition Corporation.

134. On August 3, 1998, management contracts were signed by and between 22 Acquisition Corporation and CCS giving CCS the right to manage the Beverly Homes and the Dallas Homes.

135.  Pursuant to the terms of the Cooperation Agreement, executed by Chartwell in connection with the transfer, all of Chartwell's leaseholds, receivables, and key accounting

employees were transferred to 22 and CCS. In a meeting conducted on or about August 7, 1998, 40 or 50 of Chartwell's remaining corporate staff were told to pack up their desks and arrange for interviews with CCS who agreed to interview job applicants the following day. At Licari's direction, CCS took over Chartwell's corporate headquarters and hired a team of Chartwell employees to assist in the transition.

136. By letter dated September 14, 1998, recognizing that the East Texas Noteholders were the parties most affected by the demise of Chartwell and the fraudulent conveyance of its assets, Irving Boyes, offered to convert the unpaid principal balance of their notes to a pro rata portion of the two $2 million subordinated notes from 22 Acquisition Corporation. Some of the Plaintiffs accepted the assignment, but no payments were ever made to any of them under these notes.

137. After effecting the transfer of all of Plaintiffs' secured property to 22 Acquisition Corporation, Leder quickly abandoned the Temporary Restraining Order and injunction litigation HCFP filed in Maryland. Instead, Leder negotiated directly with state Medicaid officials and fiscal intermediaries to obtain direct payment of accounts receivable due and owing to the Chartwell nursing homes. Leder ignored the automatic stay applicable to collection of the Debtors' assets and vigorously asserted HCFP's claims to state Medicaid and federal Medicare officers that it, and not the Plaintiffs, was entitled to collect the collateral on behalf of the Debtors.

G. **Fraudulent Concealment, Perjured Testimony; and Obstruction of Justice in the Chartwell Bankruptcy Proceedings**

138.   Chartwell defaulted on all of the Plaintiffs' notes by failing to pay instalments due July 1998 and thereafter.  Involuntary bankruptcy proceedings were initiated against Chartwell in October 1998.  Orders for relief were entered in these bankruptcy proceedings in December 1998 and January 1999.

139.   Shortly after the commencement of the bankruptcy proceedings, the Bankruptcy Trustees demanded and Chartwell's former officers produced over 700 boxes of Chartwell records.  However, virtually all of Chartwell's bank records were missing; and the documents relating to the foregoing sale negotiations between Chartwell and the defendants were also missing. The bank records are still missing (and probably were shredded); but the documents relating to defendants' sale negotiations  were discovered in a storage facility in the name of Morehead's wife in early 2002 by the United States Attorney's Office.  Morehead was indicted in February 2002  for perjury (committed  in a deposition conducted by the undersigned attorney) and obstruction of justice regarding the Chartwell Bankruptcy Proceedings.

140.   Despite numerous prior document requests, HCFP's successor by merger, Heller Healthcare Finance, Inc., failed  to produce essential documents relating to the sale of Chartwell nursing homes and misrepresented that all such documents had been produced.  On  threat of contempt, Heller produced 36 boxes of documents for the first time in April 2002.

141.   Similarly, Licari,  D'Arcangelo, and Ehmann  perjured themselves in testimony compelled in related bankruptcy cases, and misrepresented to Plaintiffs' attorney  in 1999 and 2000  that all documents relating to Chartwell had been produced.  Each and all of the defendants continued

.

to fraudulently conceal their participation, unlawful object, plan and acts in furtherance of a conspiratorial scheme to defraud the Plaintiffs by their misrepresentations to Plaintiffs' counsel and concealment of the facts set forth above despite a legal duty of disclosure.

142.  Defendant Leder fraudulently concealed the acts forming the basis of this Complaint by participating in a scheme that involved use of corporate agents and instrumentalities designed to conceal the interest that Leder and his companies held in the takeover of Plaintiffs' secured property.

## IV.

## LIMITATIONS

143.  All causes of action set forth herein are timely made.  The applicable statutes of limitation were tolled during the time that defendants and their non-defendant co-conspirators fraudulently and criminally concealed facts essential to the allegation of these claims as well as facts establishing the individual defendants' participation in such conduct and the personal interests they held in entities which were formed for the express purpose of concealing such participation.

144.    The statute of limitations was also tolled from April 2000 to December 6, 2001, because Plaintiffs were prohibited from taking action, including the conduct of discovery, during this time period under Orders of the United States Bankruptcy Court in Adversary Proceeding No. 99-3273.

145.    In addition, or in the alternative, the acts and omissions alleged herein are a continuing offense which includes conduct occurring as late as March 28, 2002, and is continuing now.

146.   In addition, or in the alternative, Plaintiffs did not discover and in the exercise of reasonable diligence could not discover facts sufficient to establish claims against the individual defendants named herein until Morehead's concealed documents became partially available in March 2002, Ehmann testified for the first time in April 2002;  FELD documents became available in 2002; and  Fishman documents became available in April 2002.

## V.

## SUBSTANTIVE COUNTS

### A. Count One: Conspiracy to Defraud, Unlawfully Interfere, and Convert; and Thereafter to Cover Up the Agreement and Participation of the Defendants

147.   Plaintiffs incorporate herein by reference paragraphs 1 through 146 above.

148.   Beginning on or around May 28, 1998, and continuing thereafter through the present time, defendants Leder, Licari, Ehmann, Fishman and D'Arcangelo, and the following non-defendant co-conspirators :  Healthcare Financial Partners, and its subsidiaries; Complete Care Services, L.P., and its subsidiaries and affiliates; FELD, LLC, and its Interest Holders; 22 Acquisition Corporation, and its attorneys and agents;  together and sometimes in concert and combination with  Chartwell's director and officers;  combined, conspired and agreed to defraud the Plaintiffs and unlawfully interfere with the Plaintiffs' investment contracts and convert the stream of government-insured receivables securing Plaintiffs' investment contracts, and thereafter to conceal the unlawful scheme, the unlawful means used to implement the scheme, and each of the defendants' participation in the scheme.

149.   Each of the defendants had knowledge of the unlawful means and objectives employed by the other defendants and knowingly participated in the conspiratorial agreement and acts and omissions in furtherance of the agreement.

150.   Each of the defendants committed one or more overt acts in furtherance of the unlawful objective and the unlawful means employed by defendants to effect the objective, which include but are not limited to the following:

(b) Formation of FELD, LLC and preparation of the FELD LLC Operating Agreement in a manner which would conceal the "Interest Holders" and real parties in interest;

(b) Leder's unlawful demands that Plaintiffs' secured property, government-insured healthcare receivables generated by Chartwell nursing homes, be deposited directly into a lockbox controlled by HCFP Funding, Inc., in violation of Chartwell's obligations to Plaintiffs under pre-existing contacts and security agreements; and with knowledge that compliance with such demands would cause Chartwell to default under its investment contracts with Plaintiffs;

(c) Conducting fraudulent negotiations for the purchase of Chartwell's stock, without disclosing HCFP's interest and participation in such purchase negotiations and with no intent to perform;

(d) Use of confidential and proprietary information obtained through fraudulent and misleading offers to purchase the stock of Chartwell Healthcare, Inc. in a manner that was reasonably calculated to injure the property interests securing Plaintiffs' investment contracts;

(e)  Leder's demands  that Chartwell make immediate and persistent efforts to sell the Chartwell corporations  and/or its operating assets despite the absence of any contractual authority to require such sale;

(f) Licari's meetings and communications with healthcare regulators both prior to and subsequent to the July 31 payroll default;

(g) Licari and D'Arcangelo's collection and disposition of accounts receivable pledged to Plaintiffs as security for their investment contracts;

(h) Defendants' failure to accurately account for assets transferred to a "special utility" corporation which they controlled; and

(i) Defendants' misrepresentations, misleading half-truths, and concealment of negotiations and demands made between May 28 and July 31 with each other and the Chartwell director and officers.

151.   Defendants' wrongdoing proximately caused Plaintiffs to lose the value of their investment contracts and the value of the property securing such investments. Plaintiffs seek and are entitled to recover their actual damages from each of the defendants, jointly and severally.

152.   Defendants' conduct was malicious, wilful and wanton, and Defendants profited from their wrongdoing at Plaintiffs' expense.   Accordingly, Plaintiffs are entitled to recover exemplary damages in an amount sufficient to deter such wrongdoing in the future.

**B. Count Two: Conversion**

153.   Plaintiffs incorporate herein by reference paragraphs 1 through 152 above.

154. Defendants Leder, Licari and Ehmann improperly converted Plaintiffs' secured property, healthcare receivables and the proceeds thereof, by (among other things):

(a)   Effecting the transfer of such receivables and proceeds to a "special utility" company, 22 Acquisition Corporation, which these defendants managed and controlled, knowing that the receivables were wrongfully acquired and previously pledged;

(b)  Coercing the transfer of Chartwell leasehold interests to 22 Acquisition

Corporation which generated the accounts receivable pledged as security to Plaintiffs,

knowing that    the leaseholds were wrongfully acquired  and  could not be transferred

without the consent of  Plaintiffs, who owned a security interest in  the income stream for

such leases;  and

(c)  Disposing of the receivables and collecting the proceeds thereof without

notice and in a commercially unreasonable manner, knowing that such receivables

were wrongfully acquired.

155.  At the time of the conversion, Plaintiffs owned the security interest in the healthcare

receivables and their proceeds and had a superior right to possession.  By exercising dominion and

control over Plaintiffs' secured property and insisting that others acting at these defendants'

direction, effect such dominion and control,  defendants Leder, Licari and Ehmann  improperly

converted  Plaintiffs' security interests, and thereby destroyed the value of such security interests.

Plaintiffs suffered injury and damages proximately caused by such conversion.  Plaintiffs are

entitled  from  defendants  Leder,  Licari  and  Ehmann,  jointly  and  severally,  the  value  of  the

property converted as of August 3, 1998, and the proceeds of receivables billed after that date

from leaseholds transferred to defendants and their corporate instruments.

156.  In addition, Defendant Leder converted Plaintiffs' security interests in June and July

1998 by, among other things, requiring that Chartwell healthcare receivables previously pledged

to the Plaintiffs be deposited directly by account obligors to a lockbox controlled by Leder and

his companies; by coercing  the sale of leasehold estates which generated the receivables pledged

as security to Plaintiffs through improper threats on May 28, 1998 and thereafter; by directing

attorneys to obtain ex parte temporary restraining orders from a state court in Maryland . Plaintiffs are entitled to recover the value of the security interest they held in the Chartwell healthcare receivables as of June and July 1998.

157.  The foregoing conduct was wilful and wanton.  Plaintiffs seek and are entitled to exemplary and punitive damages in addition to their actual compensatory damages from defendants Leder, Licari and Ehmann, jointly and severally, for the wilful conversion of their security interests.

**C.  Count Three: Tortious  Interference**

158.   Plaintiffs incorporate by reference paragraphs 1- 157  above.

159.  Each of the Plaintiffs  had valid, long-term  note contracts with specified Chartwell entities secured by accounts receivable of the nursing homes acquired with their funds.
The Plaintiffs also held profit participation interests in the operating revenue of the  nursing home operating leases with the expectation of receiving a proportionate share of such operating revenues over the remaining term of the operating leases.       .

160.   Defendants Leder, Fishman,  Ehmann, and Licari,  willfully and intentionally interfered with these contracts, with knowledge of the contracts with Plaintiffs and/or with knowledge of such  facts and circumstances that would lead a reasonable person to believe that such contracts existed. Such interference induced and proximately caused the breach of contracts owed by the Chartwell subsidiaries that executed the contracts. Defendants acts of interference included but are not limited to threats and other coercive conduct leading to the deposit of all nursing home receivables to a lockbox account under Leder's control contrary to the obligations of security agreements previously executed with the Plaintiffs;  manipulating the negotiations of

the August 1 and August 3 letter agreements with key executives of Chartwell, knowing that the August 1 agreement would not be performed and the August 3 agreement would effectively sever the nursing home income stream from the Plaintiffs' debt instruments; and by subsequently ensuring the "cooperation" of Chartwell executives in separating the income stream from the security and profit participation interests held by the Plaintiffs in breach of their fiduciary and other duties owed to the Plaintiffs.

161.    Such interference was wilful and without justification or excuse, and proximately caused direct damage to the security and profit participation interests of the Plaintiffs.

### D.  Count Four: Participation in Breach of Fiduciary Duty

162.    The Plaintiffs incorporate by reference paragraphs 1 – 161 above.

163.    HCFP Funding, Inc. owed a fiduciary duty to the Plaintiffs by virtue of its possession and control of collateral in excess of HCFP's indebtedness which was previously pledged as security to the Plaintiffs.   These fiduciary duties included but were not limited to notification of lockbox requirements; notification of default; notification of intent to subordinate Plaintiffs' security interests; and disposition of secured property in a commercially reasonable manner that would maximize the recovery for both HCFP Funding, Inc. and the Plaintiffs consistent with UCC sections 9.504 and 9.507.        .

164. HCFP Funding, Inc. breached its fiduciary duties to Plaintiff by, among other things:

        (a)  Disposing of Plaintiffs' secured property without notice and in a commercially unreasonable manner;

        (b)  Transferring secured property previously pledged to Plaintiffs to a designated corporation in which HCFP Funding, Inc. held an ownership interest in return for assumption of the debt;

(c) Misrepresenting and failing to properly account for proceeds received on disposition of Plaintiffs' secured property;  and

(d) Misrepresenting and failing to properly account for indebtedness which was extinguished from proceeds received from the disposition of Plaintiffs' secured property.

165.   Defendants Leder, Licari, Fishman, and Ehmann  knowingly participated in and materially aided HCFP Funding, Inc. in breaching its fiduciary duties to the East Texas Noteholders by, among other things,  initiating  or participating in the following conduct:

(a) Leder's demand for and acceptance of a security interest in assets which Leder knew or should have known were previously conveyed to the Plaintiffs;

(b) Licari's and Ehmann's  conduct in conducting negotiations with the Chartwell representatives  which involved the sale of property secured by Plaintiffs' security interests without notice to or compensation to the Plaintiffs;

(c) Ehmann's formation of corporations which were designed to conceal the real parties in interests;

(d) Fishman's  acts in arranging for the transfer and ownership of leaseholds which generated the security pledged to Plaintiffs;

(e) D'Arcangelo's execution of contracts and documents which were designed to confuse the issue of ownership of the leaseholds transferred from Chartwell; and

(f) Leder and Licari's communications with state and federal regulators which were designed to force a transition from Chartwell to corporations which Leder and Licari controlled.

166.   Plaintiffs  suffered direct injury to their security and their profit participation interests as the direct result of defendants' wrongdoing, and are entitled to recover such damages, jointly and severally, from each of the defendants.

**E.   Count Five:   Violation of the Texas Securities Act**

167.   The Plaintiffs incorporate herein by reference paragraphs 1--166 above.

168.   The Plaintiffs' promissory notes constitute investment contracts and securities under the Texas Securities Act, Tex. Rev. Civ. Stats, art. 581-33.   The effective subordination of security interests previously pledged as security for the investment contracts constitutes a sufficient change and modification of the investment contracts to trigger the purchase and sale provisions of the Texas Securities Act.

169.   Defendants, acting in concert and combination with the Chartwell issuers of the notes and Chartwell's director and officers, violated the antifraud provisions of the Texas Securities Act, art. 581-33(A)(2) by, among other things, effecting a change in the terms of Plaintiffs' investment contracts without notice;  by failing to disclose material information relating to the subordination and sale of Plaintiffs' secured property which was necessary to make other statements made by defendants and their agents and accomplices  not misleading.

170.   In addition or in the alternative, Defendants Leder, Licari, Fishman, and Ehmann aided and abetted Chartwell's violation of the Texas Securities Act by their actions in facilitating the subordination and disposition of Plaintiffs' secured property; by concealing the true nature of the transaction and the relationships that existed between the parties; and by making  false statements concerning the status of HCFP's security interest; defendants' relationship with 22 Acquisition Corporation ; and their  knowledge of the Plaintiffs' security interests.

**F.   Count Six:   Fraud in Stock Transaction (Violation of Tex. Bus. & Com. Code §27.01); and Continuing Fraud**

171.   Plaintiffs incorporate be reference paragraphs 1 -- 170 above.

172.   Defendants benefitted from the false representations and promises made by the Chartwell director and officers to the Plaintiffs. These false representations are set forth in Plaintiffs' Third Amended Complaint, filed with this Court on February 11, 2000, in Civil Action No. 3:99-CV-1242-M, which is incorporated herein for the purpose of satisfying Rule 9(b) of the Federal Rules of Civil Procedure. Defendants had an actual awareness of such false representations; they failed to disclose to plaintiffs that such representations and promises were false; and they benefitted from such false representations and promises, all in violation of section 27.01 of the Texas Business and Commerce Code. Plaintiffs relied on the false representations and promises of Chartwell's director and officers and suffered damages proximately caused by defendants' nondisclosure. Plaintiffs are entitled to recover such damages from each of the defendants, jointly and severally.

173.   In addition, or in the alternative, the conduct of the defendants in conducting negotiations for the purchase of Chartwell stock with no intent to close such purchase; the use of dummy corporations, use of fictitious management, and undisclosed "Interest Holders" in transferring property previously securing Plaintiffs' investment contracts; misrepresentations by defendants and their agents concerning ownership and collection of Plaintiffs' secured property and the value realized from such property; operated as a constructive and continuing fraud on Plaintiffs. As a result of such conduct, Plaintiffs did not and in the exercise of reasonable diligence could not discover such fraud and defendants' participation in the fraud.

174.   Plaintiffs suffered damages proximately caused by defendants' conduct. Plaintiffs are entitled to recover such damages from defendants, jointly and severally.

175.   Defendants' fraudulent conduct was malicious, wilful and wanton.   Plaintiffs are entitled to recover exemplary damages in an amount sufficient to deter such conduct in the future.

## G.   Count Seven:  Alter Ego

176.   Plaintiffs incorporate by reference paragraphs 1-175 above.

177.   Each of the defendants constitutes an alter ego for 22 Acquisition Corporation, and as such, is responsible for satisfaction of Plaintiffs' security interests which were improperly transferred to that corporation.    22 Acquisition Corporation breached its obligations to Plaintiffs by failing to make payments on investment contracts and security interests on which it was a *de facto* successor.

178.   Plaintiffs suffered damages proximately caused by breach of duties and obligations and other wrongful conduct committed by 22 Acquisition Corporation.   Each of the defendants is liable for such damages proximately caused by such conduct.

## H.  Count Eight: Attorney's Fees

179.   Plaintiffs incorporate by reference paragraphs 1-- 178 above.

180.   As a result of the foregoing conduct, Plaintiffs were required to retain the undersigned attorneys.   Plaintiffs are entitled to recover their attorney's fees pursuant to the Texas Securities Act, Chapter 38 of the Texas Civil Practice and Remedies Code, and Texas Business and Commerce Code, section (e).

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of each and every issue presented herein.

## IV.

### RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer the charges contained herein and that upon final hearing, Plaintiffs recover the following:

(1)   Actual and Consequential Damages  determined by the trier of fact;

(2)   treble and/or exemplary or punitive damages;

(3)   attorney's fees and costs of court;

(4)   such other and further relief to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

REYNA, HINDS & CRANDALL

Jeanne Crandall
State Bar No. 05005700
1201 Elm Street, Suite 3850
Dallas, Texas  75270
214/760-8100
214/760-8109 (fax)

ATTORNEY FOR PLAINTIFFS